**FILED**
CLERK, U.S. DISTRICT COURT

10/27/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eva _____ DEPUTY

1  NICOLA T. HANNA
United States Attorney
2  BRANDON D. FOX
Assistant United States Attorney
3  Chief, Criminal Division
RYAN G. ADAMS (Cal. Bar No. 262227)
4  Special Assistant United States Attorney
Santa Ana Branch Office
5      United States Courthouse
    411 West 4th Street, Suite 8000
6      Santa Ana, California 92701
    Telephone: (714) 338-3590
7      Facsimile: (714) 338-3708
    E-mail:    ryan.adams2@usdoj.gov
8
Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10               UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,

13         Plaintiff,

14            v.

15  MICHAEL JAMES SWEANEY,
   aka "Michael Hatton,"
16     aka "Michael Brooks,"

17         Defendant.

No. SA CR 8:20-cr-00159-RGK

PLEA AGREEMENT FOR DEFENDANT
MICHAEL JAMES SWEANEY

18

19      1.   This constitutes the plea agreement between MICHAEL JAMES

20  SWEANEY, also known as ("aka") "Michael Hatton," aka "Michael

21  Brooks," ("defendant") and the United States Attorney's Office for

22  the Central District of California ("the USAO") in the investigation

23  of Nanotech Engineering, Inc.  This agreement is limited to the USAO

24  and cannot bind any other federal, state, local, or foreign

25  prosecuting, enforcement, administrative, or regulatory authorities.

26                DEFENDANT'S OBLIGATIONS

27      2.   Defendant agrees to:

28

1    a.   Give up the right to indictment by a grand jury and,

2  at the earliest opportunity requested by the USAO and provided by the

3  Court, appear and plead guilty to a one-count information, in the

4  form attached to this agreement as Exhibit A or a substantially

5  similar form, which charges defendant with Mail Fraud in violation of

6  18 U.S.C. § 1341.

7    b.   Agree that all court appearances, including his change

8  of plea hearing and sentencing hearing, may proceed by video-

9  teleconference ("VTC") or telephone, if VTC is not reasonably

10  available, so long as such appearances are authorized by General

11  Order 20-043 or another order, rule, or statute.   Defendant

12  understands that, under the Constitution, the United States Code, the

13  Federal Rules of Criminal Procedure (including Rules 11, 32, and 43),

14  he may have the right to be physically present at these hearings.

15  Defendant understands that right and, after consulting with counsel,

16  voluntarily agrees to waive it and to proceed remotely.   Defense

17  counsel also joins in this consent, agreement, and waiver.

18  Specifically, this agreement includes, but is not limited to, the

19  following:

20    i.   Defendant consents under Federal Rules of

21  Criminal Procedure 5(f) and 10(c) and Section 15002(b) of the CARES

22  Act to proceed with his initial appearance and arraignment by VTC or

23  telephone, if VTC is not reasonably available.

24    ii.   Defendant consents under Section 15002(b) of the

25  CARES Act to proceed with his waiver of indictment, under Federal

26  Rule of Criminal Procedure 7(b), by VTC or telephone, if VTC is not

27  reasonably available.

28

iii. Defendant consents under Section 15002(b) of the CARES Act to proceed with his change of plea hearing by VTC or telephone, if VTC is not reasonably available.

iv.  Defendant consents under Section 15002(b) of the CARES Act to proceed with his sentencing hearing by VTC or telephone, if VTC is not reasonably available.

v.  Defendant consents under 18 U.S.C. § 3148 and Section 15002(b) of the CARES Act to proceed with any hearing regarding alleged violations of the conditions of pre-trial release by VTC or telephone, if VTC is not reasonably available.

c.  Not commit any crime; or any act constituting obstruction of justice; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

d.  Not contest facts agreed to in this agreement.

e.  Abide by all agreements regarding sentencing contained in this agreement.

f.  Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

g.  Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

h.  Not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

i.  Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessment.

j.    Agree to and not oppose the imposition of a condition of probation or supervised release barring defendant from soliciting funds for any purpose, working for anyone who is soliciting funds, giving advice regarding securities, or working in the securities industry.

3.   Defendant further agrees:

a.   To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, or involved in the illegal activity to which defendant is pleading guilty, specifically including, but not limited to, the following (collectively, the "Forfeitable Assets"):

i.    Approximately $25,667.50 in bank funds seized on or about December 5, 2019, from a FirstBank account ending in 6348, in the name of David Sweaney;

ii.   Approximately $85,605.22 in bank funds seized on or about December 5, 2019, from a FirstBank account ending in 0426, in the name of David Wayne Sweaney;

iii. Approximately $756,891.85 in bank funds seized on or about December 5, 2019, from a FirstBank account ending in 6364, in the name of Nanotech Engineering Inc.;

iv.   The funds associated with one Chase bank cashier's check in the amount of $457,394.75, check number 9527024742, payable to Nanotech Finance LLC, seized on or about December 5, 2019;

v.    One First National Bank cashier's check in the amount of $141,439.40, check number 934709, payable to United States Marshal Service; forfeited on or about January 3, 2020;

4

vi.   One 2003 46 foot Sea Ray 460 Sundancer yacht, hull identification number SERP56941203, bearing vessel name Bella Vita, United States Coast Guard official number 1205192;

vii. One white 2017 Achilles HB350DX white dinghy, hull identification number ACH0093A717, California license number CF5182RY;

viii.   One 2011 Maserati GranTurismo automobile, VIN ZAM45KMA3B0055168, registered to Nanotech Finance LLC;

ix.   One 2011 Maserati GranTurismo automobile, VIN ZAM45KMA6B0057268, registered to Nanotech Engineering Inc.;

x.   One 1989 Chevrolet Camaro IROC Z, VIN 1G1FP2187KL194901, registered to Nanotech Engineering Inc;

xi.   One 18k yellow gold Cartier Pasha De Cartier watch; serial number T10167930009;

xii. Approximately $3,196.00 in United States currency seized on or about December 5, 2019, from the residence at 2555 Main Street, Unit 4033, Irvine, California 92614; and

xiii.   Approximately $5,896.00 in Elizabeth II Canadian Maple Leaf Coins, seized on or about December 5, 2019.

b.   To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Assets and to the forfeiture of the assets.

c.   To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Assets, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

        d.   Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Assets.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Assets on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Assets.

        e.   Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Assets.

        f.   Not to claim that reasonable cause to seize the Forfeitable Assets was lacking.

        g.   To prevent the transfer, sale, destruction, or loss of any and all assets described above to the extent defendant has the ability to do so.

        h.   To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the USAO.

        i.   That forfeiture of Forfeitable Assets shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

        4.   With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other

means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Assets in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that forfeiture of the Forfeitable Assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

THE USAO'S OBLIGATIONS

5.    The USAO agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    Recommend a two-level downward variance pursuant to 18 U.S.C. § 3553(a).

d.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e.    Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1956 (Money Laundering) and 18 U.S.C. § 1957 (Money Laundering) arising out of

defendant's conduct described in the agreed-to factual basis set forth in paragraph 13 below.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

<u>NATURE OF THE OFFENSE</u>

6.   Defendant understands that for defendant to be guilty of the crime charged in the sole count of the information, that is, Mail Fraud, in violation of Title 18, United States Code, Section 1341, the following must be true:

(1) Defendant knowingly devised or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omitted facts.  Deceitful statements of half-truths may constitute false or fraudulent representations;

(2) The statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3) Defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and

(4) Defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

To convict defendant of mail fraud based on omission of material fact, you must find that defendant had a duty to disclose the omitted fact arising out of a relationship of trust.  That duty can arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use.  It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

## PENALTIES AND RESTITUTION

7.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1341, is: 20 years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

8.   Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offense to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty.  In particular, defendant agrees that the Court may

order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those charges.  The parties currently believe that the applicable amount of restitution is approximately $9,512,662.00, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

9.  Defendant agrees that any and all fines and/or restitution ordered by the Court will be due immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

10.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm,

the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

12.  Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

13.  Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 15 below but is not meant to be a complete recitation of all facts relevant to the

underlying criminal conduct or all facts known to either party that relate to that conduct.

BACKGROUND

Nanotech Engineering, Inc. ("Nanotech") was a Delaware corporation that maintained its principal place of business in Irvine, California, within the Central District of California, as well as operating a second location in Loveland, Colorado. Nanotech purported to be in the business of developing revolutionary solar panels that used patent-pending nanotechnology to make their solar panels more efficient than other solar panels on the market. Nanotech employed "cold-callers," unlicensed stockbrokers being paid, at least at times, on a commission basis, to solicit investments in the company, by telephone, from victim-investors located throughout the United States. Neither Nanotech nor its securities were ever registered with the United States Securities and Exchange Commission ("SEC"). Unregistered Nanotech shares were sold to victim-investors via private placement memorandum ("PPM"). Nanotech had no discernable source of income or revenue – virtually all of its funds were investor funds.

Defendant, a resident of Irvine, California, established Nanotech and was the Chief Financial Officer ("CFO"), owner and principal of Nanotech. Defendant controlled and directed the employees and business activities of Nanotech, including the "cold-callers." In or around February 1998, defendant pleaded guilty to one count of felony securities fraud in Nevada state court. Beginning in or around September 2017, and continuing through at least December 2019, defendant communicated with Nanotech victim-investors using the aliases "Michael Brooks" and "Michael Hatton."

12

Despite efforts to hide his true identity from Nanotech victim-investors, defendant listed his legal name, "Michael Sweaney," on multiple Nanotech bank account forms.  Defendant diverted victim-investor funds for his personal use.

DAVID WAYNE SWEANEY ("D. SWEANEY"), a resident of Fort Collins, Colorado, was listed on documents as the Chief Executive Officer ("CEO") of Nanotech and supervised the Loveland, Colorado location. D. SWEANEY is the nephew of defendant.  D. SWEANEY built the Nanotech website and updated the content of the website at the direction of defendant.  In or around March 2018, at the direction of defendant, D. SWEANEY established the main Nanotech bank accounts.  D. SWEANEY was the signatory on the main Nanotech bank accounts and deposited victim-investor checks in those accounts at the direction of defendant.  At the direction of defendant, Nanotech employees in the Irvine, California office mailed D. SWEANEY checks received from victim-investors, via FedEx, for D. SWEANEY to deposit in the Nanotech bank accounts.  D. SWEANEY diverted victim-investor funds for his personal use.

JEFFERY GANGE ("GANGE"), a resident of Irvine, California, was the Chief Operations Officer ("COO") of Nanotech.  GANGE signed three materially false and misleading Forms D that Nanotech filed with the SEC.  At the direction of defendant, GANGE established and was the signatory on several bank accounts for entities where Nanotech transferred victim-investor funds.

THE FRAUDULENT SCHEME

Beginning in or around September 2017, and continuing through at least December 2019, in Orange County, within the Central District of California, and elsewhere, defendant, together with others, knowingly

and with intent to defraud, devised, participated in, and executed a scheme to defraud investors as to material matters, and to obtain money and property from investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, relating to investments in Nanotech.

The fraudulent scheme was carried out, in substance, as follows:

a. Nanotech employed "cold-callers," unlicensed stockbrokers paid, at least at times, on a commission basis, in a "boiler-room" type environment. The "cold-callers" operated out of the Nanotech office in Irvine, California. Potential victim-investors were contacted via telephone by the "cold-callers" who operated off of written scripts. When the "cold-callers" contacted potential victim-investors, they would use high pressure sales tactics to try to get the victim-investors to view a web-share presentation and, ultimately, to invest. Through false and fraudulent statements and digital and written materials, the "cold-callers" solicited investments in Nanotech stock from victim-investors. These false and fraudulent statements included the following: (1) The Nanotech "Nanopanel" presently existed; (2) The Nanotech "Nanopanel" had an efficiency rate of three times silicon solar panels currently on the market; (3) The Nanotech "Nanopanel" was a third of the cost of silicon solar panels currently on the market; (4) The Nanotech "Nanopanel" was the size of a FedEx envelope but stronger, more lightweight and flexible than silicon panels; (5) Nanotech would have 60-70% of the sales of the solar market in the first few years; and (6) The Nanotech "Nanopanel" would take over the solar industry. All of these statements were materially false and misleading as the "Nanopanel" did not exist.

            b.    Potential victim-investors were provided with a PPM if they decided to invest, and a subscription agreement, which outlined the terms of the investment.  Nanotech's website, www.nanotechengineeringinc.com, had the PPM available for potential victim-investors to download as well.  The PPM contained multiple material false representations and omissions of material facts, including: (1) falsely stating that the CFO's name was Michael Hatton to conceal defendant's true identity and prior conviction for felony securities fraud; (2) falsely stating that the majority of investor money would be used only for overhead expenses and the manufacture of "Nanopanels," when defendant, and others, in fact used a significant portion of investor money for personal expenses; (3) falsely stating that Nanotech employed engineers who developed the "Nanopanel;" and (4) failing to disclose that investor money was being transferred to other entities owned or controlled by defendant, D. SWEANEY and GANGE.

            c.    Potential investors were provided with Nanotech's banking information so that they could wire funds to Nanotech or provided a pre-paid FedEx envelope to send checks to the Nanotech office in Irvine, California.  Victim-investor checks received were then sent, at the direction of defendant, via FedEx, by a Nanotech employee in Irvine, California to D. SWEANEY in Loveland, Colorado.  D. SWEANEY, at the direction of defendant, deposited victim-investor checks in the Nanotech bank accounts in Colorado.

            d.    On or around November 17, 2017, defendant sent an email from California to D. SWEANEY in Colorado, instructing D. SWEANEY to create a non-functioning prop of what the "Nanopanel"

would look like and provided the specifications for what the prop panel should look like.

      e.   On or around January 27, 2018, defendant sent an email from California to D. SWEANEY in Colorado, with the subject line, "TO DO-TO STAY OUT OF JAIL."  The email instructed D. SWEANEY to build a "Nanopanel" and stated, "We need to spend ALOT OF CASH, we need IMMEDIATELY equipment in the warehouse, without it JAIL, and that's no joke, no equipment and using investment funds EQUALS JAIL, however spending money on equipment WILL SET US FREE."  D. SWEANEY had no education or experience in nanotechnology or solar power prior to his involvement with Nanotech.  D. SWEANEY's primary source of employment prior to Nanotech consisted of managing restaurants.

      f.   On or around March 14, 2018, defendant sent an email from California to D. SWEANEY in Colorado, containing a script and directions on how to film a video purportedly depicting a functioning Nanotech "Nanopanel" outperforming a standard large silicon solar panel.  D. SWEANEY, at the direction of defendant, created a video purportedly depicting a functioning Nanotech "Nanopanel" that defendant instructed "cold-callers" to show potential victim-investors.  At the direction of defendant, D. SWEANEY posted the video online for potential victim-investors to view, to induce potential victim-investors to invest in Nanotech.  The "cold-callers" told victim-investors the video was "absolute proof" of how the "Nanopanel" outperformed even the most efficient silicon panel on the market.  The video captured a side-by-side comparison which depicted a purported functioning "Nanopanel" versus a standard large silicon solar panel.  In the video, an actor hired by D. SWEANEY, at the direction of defendant, demonstrated the "Nanopanel" outperforming a

standard large silicon solar panel, even though the "Nanopanel" was approximately ten times smaller than the silicon panel.  In reality, Nanotech never developed a functioning "Nanopanel."  In the video, Nanotech used a small standard silicon solar panel and powered it with a concealed battery pack to make the purported "Nanopanel" appear to outperform the large standard silicon solar panel.

g.   On or around May 17, 2018, Nanotech filed its first Form D with the SEC regarding the offering.  The May 2018 Form D had multiple misstatements and omissions of material facts that were never corrected by Nanotech, including: (1) listing only D. SWEANEY as a related person, when in reality multiple other persons served as Nanotech's executive officers, including defendant and GANGE; (2) failing to disclose that while D. SWEANEY was the CEO of Nanotech on paper, Nanotech was actually controlled by defendant; (3) listing D. SWEANEY as the only individual being paid commission, when in reality Nanotech paid sales commissions to numerous "cold-callers;" (4) disclosing that D. SWEANEY would only receive $15 of the funds raised through the offering, in reality D. SWEANEY had received substantially more of the funds raised through the offering; and (5) failing to disclose that defendant and GANGE were receiving funds raised through the offering.  GANGE, at the direction of defendant, signed and electronically filed the Form D on behalf of Nanotech.

h.   On or around June 14, 2018, Nanotech filed a second, amended, Form D with the SEC regarding the offering.  The June 2018 Form D repeated the same material misrepresentations and omissions as the May 2018 Form D, although by then defendant, D. SWEANEY and GANGE had diverted more victim-investor money to themselves.  Again, GANGE

at the direction of defendant, signed and electronically filed the Form D on behalf of Nanotech.

i.   In or around October 2018, D. SWEANEY, at the direction of defendant, purchased approximately $300,000 in used silicon solar panel manufacturing equipment from a defunct silicon solar panel company.  Defendant directed D. SWEANEY to assemble the equipment at the Nanotech facility in Loveland, Colorado. D. SWEANEY, on at least two occasions, at the direction of defendant, arranged for potential victim-investors, who wanted to verify that Nanotech had a legitimate operation, to tour the Nanotech facility in Loveland, Colorado.  Defendant, and others, falsely represented to victim-investors that the equipment was valued at $100 million.

j.   On or around February 11, 2019, Nanotech filed a third Form D with the SEC regarding the offering.  In the February 2019 Form D, Nanotech falsely indicated it had sold $3.6 million in securities, when in fact more than $4.8 million had been raised from investors by that point.  The February 2019 Form D repeated the same material misrepresentations and omissions as Nanotech's prior two Forms D, although by then defendant, D. SWEANEY and GANGE had diverted more victim-investor money to themselves.  Again, GANGE at the direction of defendant, signed and electronically filed the Form D on behalf of Nanotech.

k.   In or around August 2019, defendant instructed GANGE, via text message, not to contradict a "cold-caller" when speaking to victim-investor A.C. and to try to stay off the phone with him. Defendant instructed GANGE to follow the "cold-caller's" lead when telling victim-investor A.C. that Nanotech had raised close to $20 million, when in reality Nanotech had raised approximately $7.6

million at that point.  Defendant text messaged GANGE, "ALL WE NEED IS ONE CONTRADICTION AND GUY WILL DEMAND TWO MILLION BACK."

l.   On or about September 4, 2019, defendant, masquerading under the alias "Michael Hatton," solicited an investment in Nanotech, via telephone, from an FBI Undercover Special Agent ("UC") acting as a potential investor.  During the telephone call, defendant made several material misrepresentations to the UC including: (1) Nanotech did not pay commissions to "cold-callers," in reality Nanotech paid "cold-callers" between 10-15% commissions; (2) Nanotech's operating costs were not more than 16.5%; (3) Nanotech's equipment was worth $100 million; and (4) an investment in Nanotech was safe because Nanotech's equipment was worth more than the amount of investor funds raised.

m.   From in or around September 2017 through at least November 2019, defendant, D. SWEANEY and GANGE transferred a large portion of victim-investor funds to other entities they controlled or used the funds for personal expenses including: (1) a luxury yacht; (2) three sports cars; (3) cosmetic surgery; (4) dental care; (5) jewelry; (6) luxury fashion; and (7) Amazon purchases.

Through the fraudulent scheme described above, defendant, and others, caused over 100 victim-investors to pay Nanotech approximately $9,512,662.

At the time the false and fraudulent pretenses, representations, promises, and omitted facts described above were made, defendant knew they were being made, and knew they were false.  The pretenses, representations, promises, and omitted facts were material because they were capable of influencing the decisions of victim-investors, or potential victim-investors.

1  THE USE OF THE MAIL

2      To carry out an essential part of the fraudulent scheme,

3  defendant, within the Central District of California, caused items to

4  be delivered by a private or commercial interstate carrier, namely

5  FedEx, and it was foreseeable to defendant that mails and commercial

6  interstate carriers would be used.  In particular on or about June

7  28, 2019, defendant knowingly caused the following item to be

8  delivered by a private or commercial interstate carrier: a check from

9  victim-investor A.C. for $1,000,000 payable to Nanotech Engineering

10  Inc., sent, via FedEx, by an employee in the Nanotech Irvine,

11  California office to D. SWEANEY in Loveland, Colorado.

12                          SENTENCING FACTORS

13      14.  Defendant understands that in determining defendant's

14  sentence the Court is required to calculate the applicable Sentencing

15  Guidelines range and to consider that range, possible departures

16  under the Sentencing Guidelines, and the other sentencing factors set

17  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

18  Sentencing Guidelines are advisory only, that defendant cannot have

19  any expectation of receiving a sentence within the calculated

20  Sentencing Guidelines range, and that after considering the

21  Sentencing Guidelines and the other § 3553(a) factors, the Court will

22  be free to exercise its discretion to impose any sentence it finds

23  appropriate up to the maximum set by statute for the crime of

24  conviction.

25      15.  Defendant and the USAO agree to the following applicable

26  Sentencing Guidelines factors:

27      Base Offense Level:              7        U.S.S.G. § 2B1.1(a)(1)

28

                                   20

Specific Offense
Characteristics:

| | | |
|---|---|---|
| Loss of more than $9,500,000 | +20 | U.S.S.G. § 2B1.1(b)(1)(K) |
| More than 10 victims | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Aggravating Role:<br>Leader/Organizer | +4 | U.S.S.G. § 3B1.1(a) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

16. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

17. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

18. Defendant understands that by pleading guilty, defendant gives up the following rights:

    a. The right to persist in a plea of not guilty.

    b. The right to a speedy and public trial by jury.

    c. The right to be represented by counsel – and if necessary have the Court appoint counsel – at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

    d. The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

19.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

20.   Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than 151 months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the

statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $9,512,662; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7); and any conditions of probation or supervised release agreed to by defendant in paragraph 2 above.

21.   The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than 121 months, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the amount of restitution ordered if that amount is less than $9,512,662.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

22.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations

will be tolled between the date of defendant's signing of this
agreement and the filing commencing any such action; and
(ii) defendant waives and gives up all defenses based on the statute
of limitations, any claim of pre-indictment delay, or any speedy
trial claim with respect to any such action, except to the extent
that such defenses existed as of the date of defendant's signing this
agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

23.  Defendant agrees that if the count of conviction is
vacated, reversed, or set aside, both the USAO and defendant will be
released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

24.  This agreement is effective upon signature and execution of
all required certifications by defendant, defendant's counsel, and an
Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

25.  Defendant agrees that if defendant, at any time after the
signature of this agreement and execution of all required
certifications by defendant, defendant's counsel, and an Assistant
United States Attorney, knowingly violates or fails to perform any of
defendant's obligations under this agreement ("a breach"), the USAO
may declare this agreement breached.  All of defendant's obligations
are material, a single breach of this agreement is sufficient for the
USAO to declare a breach, and defendant shall not be deemed to have
cured a breach without the express agreement of the USAO in writing.
If the USAO declares this agreement breached, and the Court finds
such a breach to have occurred, then: (a) if defendant has previously
entered a guilty plea pursuant to this agreement, defendant will not

be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

26. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

//

//

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

27. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

28. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 15 are consistent with the facts of this case. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

29. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to

1  fulfill all defendant's obligations under this agreement.  Defendant

2  understands that no one -- not the prosecutor, defendant's attorney,

3  or the Court -- can make a binding prediction or promise regarding

4  the sentence defendant will receive, except that it will be within

5  the statutory maximum.

6                        NO ADDITIONAL AGREEMENTS

7      30.  Defendant understands that, except as set forth herein,

8  there are no promises, understandings, or agreements between the USAO

9  and defendant or defendant's attorney, and that no additional

10  promise, understanding, or agreement may be entered into unless in a

11  writing signed by all parties or on the record in court.

12              PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

13      31.  The parties agree that this agreement will be considered

14  part of the record of defendant's guilty plea hearing as if the

15  entire agreement had been read into the record of the proceeding.

16  AGREED AND ACCEPTED

17  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
18  CALIFORNIA

19  NICOLA T. HANNA
    United States Attorney

20

21  *Ryan G Adams*                                    10/19/2020
    _____                    _____
22  RYAN G. ADAMS                                  Date
    Special Assistant United States
23  Attorney

24  _____                    _____
    MICHAEL JAMES SWEANEY                           Date
25  Defendant

26  _____                    10/16/2020
    RICHARD J. BEADA                               Date
27  Attorney for Defendant MICHAEL
    JAMES SWEANEY

28

                              27

1  fulfill all defendant's obligations under this agreement.  Defendant

2  understands that no one -- not the prosecutor, defendant's attorney,

3  or the Court -- can make a binding prediction or promise regarding

4  the sentence defendant will receive, except that it will be within

5  the statutory maximum.

6  NO ADDITIONAL AGREEMENTS

7       30.   Defendant understands that, except as set forth herein,

8  there are no promises, understandings, or agreements between the USAO

9  and defendant or defendant's attorney, and that no additional

10  promise, understanding, or agreement may be entered into unless in a

11  writing signed by all parties or on the record in court.

12  PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

13       31.   The parties agree that this agreement will be considered

14  part of the record of defendant's guilty plea hearing as if the

15  entire agreement had been read into the record of the proceeding.

16  AGREED AND ACCEPTED

17  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
18  CALIFORNIA

19  NICOLA T. HANNA
   United States Attorney

20

21  _____
   RYAN G. ADAMS                          Date
22  Special Assistant United States
   Attorney
23
                                          10-16-2020
24  _____       Date
   MICHAEL JAMES SWEANEY
   Defendant
25

26  _____       Date
   RICHARD J. BEADA
27  Attorney for Defendant MICHAEL
   JAMES SWEANEY

28

1

<u>CERTIFICATION OF DEFENDANT</u>

2      I have read this agreement in its entirety.  I have had enough

3  time to review and consider this agreement, and I have carefully and

4  thoroughly discussed every part of it with my attorney.  I understand

5  the terms of this agreement, and I voluntarily agree to those terms.

6  I have discussed the evidence with my attorney, and my attorney has

7  advised me of my rights, of possible pretrial motions that might be

8  filed, of possible defenses that might be asserted either prior to or

9  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19

20  MICHAEL JAMES SWEANEY            Date
   Defendant

21

22

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

23      I am MICHAEL JAMES SWEANEY's attorney.  I have carefully and

24  thoroughly discussed every part of this agreement with my client.

25  Further, I have fully advised my client of his rights, of possible

26  pretrial motions that might be filed, of possible defenses that might

27  be asserted either prior to or at trial, of the sentencing factors

28  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

28

1   provisions, and of the consequences of entering into this agreement.

2   To my knowledge: no promises, inducements, or representations of any

3   kind have been made to my client other than those contained in this

4   agreement; no one has threatened or forced my client in any way to

5   enter into this agreement; my client's decision to enter into this

6   agreement is an informed and voluntary one; and the factual basis set

7   forth in this agreement is sufficient to support my client's entry of

8   a guilty plea pursuant to this agreement.

9

10   RICHARD J. BEADA          Date   10/16/2020

11   Attorney for Defendant MICHAEL
      JAMES SWEANEY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                    FOR THE CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,              No.

11            Plaintiff,                    I N F O R M A T I O N

12            v.                            [18 U.S.C. § 1341: Mail Fraud]

13   MICHAEL JAMES SWEANEY,
        aka "Michael Hatton" and
14          "Michael Brooks,"

15            Defendant.

16

17        The United States Attorney charges:

18                          [18 U.S.C. § 1341]

19   A.   INTRODUCTORY ALLEGATIONS

20        1.   At times relevant to this Information:

21             a.   Nanotech Engineering, Inc. ("Nanotech") was a Delaware

22   corporation that maintained its principal place of business in

23   Irvine, California, within the Central District of California, as

24   well as operating a second location in Loveland, Colorado.  Nanotech

25   purported to be in the business of developing revolutionary solar

26   panels that used patent-pending nanotechnology to make its solar

27   panels more efficient than other solar panels on the market.  Neither

28   Nanotech nor its securities were ever registered with the United

States Securities and Exchange Commission ("SEC").  Unregistered Nanotech shares were sold to victim-investors via a private placement memorandum ("PPM").  Nanotech had no discernable source of income or revenue – virtually all of its funds were victim-investor funds.

b.   Defendant MICHAEL JAMES SWEANEY, also known as "Michael Hatton" and "Michael Brooks," a resident of Irvine, California, established Nanotech and was the Chief Financial Officer ("CFO"), owner, and principal of Nanotech.  Defendant SWEANEY controlled and directed the employees and business activities of Nanotech, including the "cold-callers."  In or around February 1998, defendant SWEANEY pleaded guilty to one count of felony securities fraud in Nevada state court.  Beginning in or around September 2017, and continuing through at least December 2019, defendant SWEANEY communicated with Nanotech victim-investors using the aliases "Michael Hatton" and "Michael Brooks."  Despite efforts to hide his true identity from Nanotech victim-investors, defendant SWEANEY listed his legal name, "Michael Sweaney," on multiple Nanotech bank account forms.  Defendant SWEANEY diverted victim-investor funds for his personal use.

c.   Co-Schemer 1 ("CS-1"), a resident of Fort Collins, Colorado, was listed on documents as the Chief Executive Officer ("CEO") of Nanotech and supervised the Loveland, Colorado location. CS-1 is the nephew of defendant SWEANEY.  CS-1 built the Nanotech website and updated the content of the website at the direction of defendant SWEANEY.  In or around March 2018, at the direction of defendant SWEANEY, CS-1 established the main Nanotech bank accounts. CS-1 was the signatory on the main Nanotech bank accounts and deposited victim-investor checks in those accounts at the direction

of defendant SWEANEY.  At the direction of defendant SWEANEY,

Nanotech employees at its Irvine, California office mailed CS-1

checks received from victim-investors, via FedEx, for CS-1 to deposit

in the Nanotech bank accounts.  CS-1 diverted victim-investor funds

for his personal use.

d.   Co-Schemer 2 ("CS-2"), a resident of Irvine,

California, was the Chief Operations Officer of Nanotech.  CS-2

signed three materially false and misleading Forms D that Nanotech

filed with the SEC.  At the direction of defendant SWEANEY, CS-2

established and was the signatory on several bank accounts for

entities where Nanotech transferred victim-investor funds.

B.   THE FRAUDULENT SCHEME

2.   Beginning in or around September 2017, and continuing

through at least in or around December 2019, in Orange County, within

the Central District of California, and elsewhere, defendant SWEANEY,

together with others, knowingly and with intent to defraud, devised,

participated in, and executed a scheme to defraud investors as to

material matters, and to obtain money and property from investors by

means of material false and fraudulent pretenses, representations,

and promises, and the concealment of material facts, relating to

investments in Nanotech.

3.   The fraudulent scheme was carried out, in substance, as

follows:

a.   Nanotech would employ "cold-callers," unlicensed

stockbrokers paid, at least at times, on a commission basis, in a

"boiler-room"-type environment to solicit investments in the company

from victim-investors located throughout the United States.  The

"cold-callers" operated out of the Nanotech office in Irvine,

California.   Potential victim-investors were contacted via telephone by the "cold-callers," who operated off of written scripts.   When the "cold-callers" contacted potential victim-investors, the "cold-callers" would use high-pressure sales tactics to try to get the victim-investors to view a web-share presentation and, ultimately, to invest.   Through false and fraudulent statements and digital and written materials, the "cold-callers" solicited investments in Nanotech stock from victim-investors.   These false and fraudulent statements included the following: (1) The Nanotech "Nanopanel" presently existed; (2) The Nanotech "Nanopanel" had an efficiency rate of three times that of silicon solar panels currently on the market; (3) The Nanotech "Nanopanel" was a third of the cost of silicon solar panels currently on the market; (4) The Nanotech "Nanopanel" was the size of a FedEx envelope but stronger, and more lightweight and flexible than silicon panels; (5) Nanotech would have 60-70% of the sales of the solar market in the first few years; and (6) The Nanotech "Nanopanel" would take over the solar industry.   All of these statements were materially false and misleading as the Nanotech "Nanopanel" did not exist.

b.   Potential victim-investors who decided to invest would be provided with a PPM and a subscription agreement, which outlined the terms of the investment.   Nanotech's website, www.nanotechengineeringinc.com, had the PPM available for potential victim-investors to download as well.   The PPM contained multiple material false representations and omissions of material fact, including: (1) falsely stating that the CFO's name was Michael Hatton to conceal defendant SWEANEY's true identity and prior conviction for felony securities fraud; (2) falsely stating that the majority of

1   investor money would be used only for overhead expenses and the

2   manufacture of "Nanopanels," when defendant SWEANEY, and others, in

3   fact used a significant portion of investor money for personal

4   expenses; (3) falsely stating that Nanotech employed engineers who

5   developed the "Nanopanel"; and (4) failing to disclose that investor

6   money was being transferred to other entities owned or controlled by

7   defendant SWEANEY, CS-1, and CS-2.

8         c.    Potential investors would be provided with Nanotech's

9   banking information so that they could wire funds to Nanotech, or

10  were provided a pre-paid FedEx envelope to send checks to the

11  Nanotech office in Irvine, California.  Victim-investor checks

12  received were then sent, at the direction of defendant SWEANEY, via

13  FedEx, by a Nanotech employee in Irvine, California to CS-1 in

14  Loveland, Colorado.  CS-1, at the direction of defendant SWEANEY,

15  deposited victim-investor checks in the Nanotech bank accounts in

16  Colorado.

17        d.    Defendant SWEANEY would send emails from California to

18  CS-1 in Colorado, instructing CS-1 to build a "Nanopanel" and to

19  create a non-functioning prop of what the "Nanopanel" would look

20  like, despite the fact that CS-1 had no education or experience in

21  nanotechnology or solar power prior to his involvement with Nanotech;

22  CS-1's primary source of employment prior to Nanotech consisted of

23  managing restaurants.

24        e.    Defendant SWEANEY would send an email from California

25  to CS-1 in Colorado, containing a script and directions on how to

26  film a video purportedly depicting a functioning Nanotech "Nanopanel"

27  outperforming a standard large silicon solar panel.  CS-1, at the

28  direction of defendant SWEANEY, created a video purportedly depicting

a functioning Nanotech "Nanopanel" that defendant SWEANEY instructed "cold-callers" to show potential victim-investors.  At the direction of defendant SWEANEY, CS-1 posted the video online for potential victim-investors to view, to induce potential victim-investors to invest in Nanotech.  The "cold-callers" told victim-investors the video was "absolute proof" of how the "Nanopanel" outperformed even the most efficient silicon panel on the market.  The video captured a side-by-side comparison which depicted a purportedly functioning "Nanopanel" versus a standard large silicon solar panel.  In the video, an actor hired by CS-1, at the direction of defendant SWEANEY, demonstrated the "Nanopanel" outperforming a standard large silicon solar panel, even though the "Nanopanel" was approximately ten times smaller than the silicon panel.  In reality, Nanotech never developed a functioning "Nanopanel."  In the video, Nanotech used a small standard silicon solar panel and powered it with a concealed battery pack to make the purported "Nanopanel" appear to outperform the large standard silicon solar panel.

    f.  Nanotech would file Forms D with the SEC regarding the offering containing multiple misstatements and omissions of material fact that were never corrected by Nanotech, including but not limited to: (1) listing only CS-1 as a related person, when in reality multiple other persons served as Nanotech's executive officers, including defendant SWEANEY and CS-2; (2) failing to disclose that while CS-1 was the CEO of Nanotech on paper, Nanotech was actually controlled by defendant SWEANEY; (3) listing CS-1 as the only individual being paid commission, when in reality Nanotech paid sales commissions to numerous "cold-callers"; (4) misstating that CS-1 would receive only $15 of the funds raised through the offering, when

in reality CS-1 had received substantially more of the funds raised through the offering; and (5) failing to disclose that defendant SWEANEY and CS-2 were receiving funds raised through the offering. CS-2, at the direction of defendant SWEANEY, signed and electronically filed the Forms D on behalf of Nanotech.

g.   CS-1, at the direction of defendant SWEANEY, would purchase approximately $300,000 in used silicon solar panel manufacturing equipment from a defunct silicon solar panel company. Defendant SWEANEY directed CS-1 to assemble the equipment at the Nanotech facility in Loveland, Colorado.  CS-1, on at least two occasions, at the direction of defendant SWEANEY, arranged for potential victim-investors, who wanted to verify that Nanotech had a legitimate operation, to tour the Nanotech facility in Loveland, Colorado.  Defendant SWEANEY, and others, falsely represented to victim-investors that the equipment was valued at $100 million.

h.   Defendant SWEANEY would instruct CS-2, via text message, not to contradict a "cold-caller" when speaking to victim-investor A.C. and to try to stay off the phone with him.  Defendant SWEANEY instructed CS-2 to follow the "cold-caller's" lead when telling victim-investor A.C. that Nanotech had raised close to $20 million, when in reality Nanotech had raised approximately $7.6 million at that point.  Defendant SWEANEY texted to CS-2, "ALL WE NEED IS ONE CONTRADICTION AND GUY WILL DEMAND TWO MILLION BACK."

i.   Defendant SWEANEY, masquerading under the alias "Michael Hatton," would solicit an investment in Nanotech, via telephone, from an individual who defendant SWEANEY believed to be a potential investor, but  who, unbeknownst to defendant SWEANEY, was actually an FBI Undercover Special Agent ("UC").  During the

telephone call, defendant SWEANEY made several material misrepresentations to the UC including: (1) Nanotech did not pay commissions to "cold-callers," when in reality Nanotech paid "cold-callers" between 10-15% commissions; (2) Nanotech's operating costs were not more than 16.5% of the funds raised; (3) Nanotech's equipment was worth $100 million; and (4) an investment in Nanotech was safe because Nanotech's equipment was worth more than the amount of investor funds raised.

       j.   Defendant SWEANEY, CS-1, and CS-2 would transfer a large portion of victim-investor funds to other entities they controlled, or would use the funds for personal expenses, including: (1) a luxury yacht; (2) three sports cars; (3) cosmetic surgery; (4) dental care; (5) jewelry; (6) luxury fashion; and (7) Amazon purchases.

    4.   By means of the fraudulent scheme described above, defendant SWEANEY, and others, caused over 100 victim-investors to pay Nanotech approximately $9,512,662.

    5.   At the time the false and fraudulent pretenses, representations, promises, and omitted facts described above were made, defendant SWEANEY knew they were being made, and knew they were false.  The false and fraudulent pretenses, representations, promises, and omitted facts were material because they were capable of influencing the decisions of victim-investors, or potential victim-investors.

//

//

//

38

1   C.   THE USE OF THE MAIL

2        6.    To carry out an essential part of the fraudulent scheme,

3   defendant SWEANEY, within the Central District of California, caused

4   items to be delivered by a private or commercial interstate carrier,

5   namely FedEx, and it was foreseeable to him that mails and commercial

6   interstate carriers would be used.  In particular, on or about June

7   28, 2019, for the purpose of executing the fraudulent scheme,

8   defendant SWEANEY knowingly caused an item to be delivered by a

9   private and commercial interstate carrier, namely, a check from

10  victim-investor A.C. for $1,000,000 payable to Nanotech Engineering

11  Inc., sent, via FedEx, by an employee in the Nanotech Irvine,

12  California office to CS-1 in Loveland, Colorado.

13                                    NICOLA T. HANNA
                                      United States Attorney
14

15

16                                    BRANDON D. FOX
                                      Assistant United States Attorney
17                                    Chief, Criminal Division

18                                    BENJAMIN R. BARRON
                                      Assistant United States Attorney
19                                    Chief, Santa Ana Branch Office

20                                    DANIEL H. AHN
                                      Assistant United States Attorney
21                                    Deputy Chief, Santa Ana Branch
                                      Office
22
                                      RYAN G. ADAMS
23                                    Special Assistant United States
                                      Attorney
24                                    Santa Ana Branch Office

25

26

27

28