TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
RYAN G. ADAMS (Cal. Bar No. 262227)
Special Assistant United States Attorney
     United States Courthouse
     411 West 4th Street, Suite 8000
     Santa Ana, California 92701
     Telephone: (714) 338-3590
     Facsimile: (714) 338-3708
     E-mail:    ryan.adams2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 8:20-cr-00159-JLS-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MICHAEL JAMES SWEANEY |
| v. | |
| MICHAEL JAMES SWEANEY, aka "Michael Hatton" and "Michael Brooks, | Hearing Date: February 18, 2022
Hearing Time: 9:30 a.m.
Location:     Courtroom of the
              Hon. Josephine L.
              Staton |
| Defendant. | |

   Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Special Assistant United States Attorney Ryan G. Adams, hereby files its Sentencing Position.

   This Sentencing Position is based upon the attached memorandum of points and authorities, the Presentence Investigation Report, the Victim Impact Statements lodged separately under seal, the files and records in this case, the plea agreement, and such further evidence and argument as the Court may permit.  The government respectfully

requests the opportunity to supplement its position or respond to defendant as may become necessary.

Dated: February 4, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
RYAN G. ADAMS
Special Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION.....................................................1

II.  STATEMENT OF FACTS...............................................2

III. ARGUMENT.........................................................9

     A.   Advisory Guidelines Calculation............................9

     B.   Downward Variance.........................................10

     C.   Other Sentencing Factors..................................10

          1.   Nature and Circumstances of the Offense/History
               and Characteristic of Defendant......................11

          2.   Need for the Sentence to Reflect the Seriousness
               of the Offense, Promote Respect for the Law,
               Provide Just Punishment, and Afford Adequate
               Deterrence...........................................13

          3.   Need to Avoid Unwarranted Sentence Disparities.......14

          4.   Restitution and Supervised Release...................14

IV.  CONCLUSION......................................................15

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Cases**

United States v. Cantrell,
  433 F.3d 1269 (9th Cir. 2006) ................................... 10
United States v. Goff,
  501 F.3d 250 (3d Cir. 2007) ................................. 13, 14
United States v. Knows His Gun,
  438 F.3d 913 (9th Cir. 2006) .................................... 11
United States v. Mares,
  402 F.3d 511 (5th Cir. 2005) .................................... 14
United States v. Nichols,
  464 F.3d 1117 (9th Cir. 2006) ................................... 11

**Statutes**

18 U.S.C. § 3553(a) ............................................ 1, 10
18 U.S.C. § 3663A .............................................. 1, 14
18 U.S.C. § 3553(a)(2)(B) ......................................... 13
18 U.S.C. § 3553(a)(6) ............................................ 13

**Other**

U.S.S.G. § 2B1.1(a)(1) ........................................... .9
U.S.S.G. § 2B1.1(b)(1)(K) .........................................10
U.S.S.G. § 2B1.1(b)(2)(A) ........................................ 10
U.S.S.G. § 3B1.1(a) ...............................................10
U.S.S.G. § 3E1.1(a) ...............................................10
U.S.S.G. § 3E1.1(b) ...............................................10

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On April 9, 2021, pursuant to a plea agreement, defendant MICHAEL JAMES SWEANEY ("defendant") pled guilty to the sole count of the Information charging him with mail fraud, in violation of 18 U.S.C. § 1341.  (Dkt. 4 ("Plea Agmt."), 32).

On August 20, 2021, the United States Probation Office ("USPO") filed its Presentence Investigation Report ("PSR") (Dkt. No. 34) and disclosed recommendation letter (Dkt. No. 33) in this matter.  As detailed in the PSR, the USPO has determined that the total applicable offense level is 30, given the base offense level, specific offense characteristics, adjustment for aggravating role, and credit for acceptance of responsibility.  The USPO also determined that defendant falls within Criminal History Category I. Using an offense level of 30 and Criminal History Category I, the USPO calculated a Guidelines range of 97 to 121 months.

As reflected below, the government agrees with the USPO's calculated Guidelines range, and its determination of the Criminal History Category I.  In addition, consistent with the plea agreement, the government requests a two-level downward variance from the applicable total offense level of 30 under 18 U.S.C. § 3553(a). Accordingly, the government requests that the Court sentence defendant as follows: (1) a high-end sentence of 97 months' imprisonment; (2) a three-year term of supervised release; (3) restitution of $9,771,052.80; and (4) a $100 special assessment.

With regard to restitution, this Court should order defendant to pay restitution pursuant to 18 U.S.C. § 3663A as detailed in the PSR. (PSR at 33-36).

## II. STATEMENT OF FACTS

Pursuant to the plea agreement in this case, defendant agreed with the following factual basis:

BACKGROUND

Nanotech Engineering, Inc. ("Nanotech") was a Delaware corporation that maintained its principal place of business in Irvine, California, within the Central District of California, as well as operating a second location in Loveland, Colorado. Nanotech purported to be in the business of developing revolutionary solar panels that used patent-pending nanotechnology to make their solar panels more efficient than other solar panels on the market. Nanotech employed "cold-callers," unlicensed stockbrokers being paid, at least at times, on a commission basis, to solicit investments in the company, by telephone, from victim-investors located throughout the United States. Neither Nanotech nor its securities were ever registered with the United States Securities and Exchange Commission ("SEC"). Unregistered Nanotech shares were sold to victim-investors via private placement memorandum ("PPM"). Nanotech had no discernable source of income or revenue – virtually all of its funds were investor funds.

Defendant, a resident of Irvine, California, established Nanotech and was the Chief Financial Officer ("CFO"), owner and principal of Nanotech. Defendant controlled and directed the employees and business activities of Nanotech, including the "cold-callers." In or around February 1998, defendant pleaded guilty to one count of felony securities fraud in Nevada state court. Beginning in or around September 2017, and continuing through at least December 2019, defendant communicated with Nanotech victim-

investors using the aliases "Michael Brooks" and "Michael Hatton." Despite efforts to hide his true identity from Nanotech victim-investors, defendant listed his legal name, "Michael Sweaney," on multiple Nanotech bank account forms. Defendant diverted victim-investor funds for his personal use.

DAVID WAYNE SWEANEY ("D. SWEANEY"), a resident of Fort Collins, Colorado, was listed on documents as the Chief Executive Officer ("CEO") of Nanotech and supervised the Loveland, Colorado location. D. SWEANEY is the nephew of defendant. D. SWEANEY built the Nanotech website and updated the content of the website at the direction of defendant. In or around March 2018, at the direction of defendant, D. SWEANEY established the main Nanotech bank accounts. D. SWEANEY was the signatory on the main Nanotech bank accounts and deposited victim-investor checks in those accounts at the direction of defendant. At the direction of defendant, Nanotech employees in the Irvine, California office mailed D. SWEANEY checks received from victim-investors, via FedEx, for D. SWEANEY to deposit in the Nanotech bank accounts. D. SWEANEY diverted victim-investor funds for his personal use.

JEFFERY GANGE ("GANGE"), a resident of Irvine, California, was the Chief Operations Officer ("COO") of Nanotech. GANGE signed three materially false and misleading Forms D that Nanotech filed with the SEC. At the direction of defendant, GANGE established and was the signatory on several bank accounts for entities where Nanotech transferred victim-investor funds.

3

THE FRAUDULENT SCHEME

Beginning in or around September 2017, and continuing through at least December 2019, defendant, together with others, executed a scheme to defraud investors of Nanotech.

The fraudulent scheme was carried out, in substance, as follows:

a. Nanotech employed "cold-callers," unlicensed stockbrokers paid, at least at times, on a commission basis, in a "boiler-room" type environment. The "cold-callers" operated out of the Nanotech office in Irvine, California. Potential victim-investors were contacted via telephone by the "cold-callers" who operated off of written scripts. When the "cold-callers" contacted potential victim-investors, they would use high pressure sales tactics to try to get the victim-investors to view a web-share presentation and, ultimately, to invest. Through false and fraudulent statements and digital and written materials, the "cold-callers" solicited investments in Nanotech stock from victim-investors. These false and fraudulent statements included the following: (1) The Nanotech "Nanopanel" presently existed; (2) The Nanotech "Nanopanel" had an efficiency rate of three times silicon solar panels currently on the market; (3) The Nanotech "Nanopanel" was a third of the cost of silicon solar panels currently on the market; (4) The Nanotech "Nanopanel" was the size of a FedEx envelope but stronger, and more lightweight and flexible than silicon panels; (5) Nanotech would have 60-70% of the sales of the solar market in the first few years; and (6) The Nanotech "Nanopanel" would take over the solar industry. All of these statements were materially false and misleading as the "Nanopanel" did not exist.

b.  Potential victim-investors were provided with a PPM if they decided to invest, and a subscription agreement, which outlined the terms of the investment. Nanotech's website, www.nanotechengineeringinc.com, had the PPM available for potential victim-investors to download as well. The PPM contained multiple material false representations and omissions of material facts, including: (1) falsely stating that the CFO's name was Michael Hatton to conceal defendant's true identity and prior conviction for felony securities fraud; (2) falsely stating that the majority of investor money would be used only for overhead expenses and the manufacture of "Nanopanels," when defendant, and others, in fact used a significant portion of investor money for personal expenses; (3) falsely stating that Nanotech employed engineers who developed the "Nanopanel"; and (4) failing to disclose that investor money was being transferred to other entities owned or controlled by defendant, D. SWEANEY and GANGE.

c.  Potential investors were provided with Nanotech's banking information so that they could wire funds to Nanotech or provided a pre-paid FedEx envelope to send checks to the Nanotech office in Irvine, California. Victim-investor checks received were then sent, at the direction of defendant, via FedEx, by a Nanotech employee in Irvine, California to D. SWEANEY in Loveland, Colorado. D. SWEANEY, at the direction of defendant, deposited victim-investor checks in the Nanotech bank accounts in Colorado.

d.  On or around November 17, 2017, defendant sent an email from California to D. SWEANEY in Colorado, instructing D. SWEANEY to create a non-functioning prop of what the "Nanopanel"

would look like and provided the specifications for what the prop panel should look like.

e. On or around January 27, 2018, defendant sent an email from California to D. SWEANEY in Colorado, with the subject line, "TO DO-TO STAY OUT OF JAIL." The email instructed D. SWEANEY to build a "Nanopanel" and stated, "We need to spend ALOT OF CASH, we need IMMEDIATELY equipment in the warehouse, without it JAIL, and that's no joke, no equipment and using investment funds EQUALS JAIL, however spending money on equipment WILL SET US FREE." D. SWEANEY had no education or experience in nanotechnology or solar power prior to his involvement with Nanotech. D. SWEANEY's primary source of employment prior to Nanotech consisted of managing restaurants.

f. On or around March 14, 2018, defendant sent an email from California to D. SWEANEY in Colorado, containing a script and directions on how to film a video purportedly depicting a functioning Nanotech "Nanopanel" outperforming a standard large silicon solar panel. D. SWEANEY, at the direction of defendant, created a video purportedly depicting a functioning Nanotech "Nanopanel" that defendant instructed "cold-callers" to show potential victim-investors. At the direction of defendant, D. SWEANEY posted the video online for potential victim-investors to view, to induce potential victim-investors to invest in Nanotech. The "cold-callers" told victim-investors the video was "absolute proof" of how the "Nanopanel" outperformed even the most efficient silicon panel on the market. The video captured a side-by-side comparison which depicted a purported functioning "Nanopanel" versus a standard large silicon solar panel. In the video, an actor hired by D. SWEANEY, at the direction of defendant, demonstrated the "Nanopanel" outperforming a

standard large silicon solar panel, even though the "Nanopanel" was approximately ten times smaller than the silicon panel.  In reality, Nanotech never developed a functioning "Nanopanel."  In the video, Nanotech used a small standard silicon solar panel and powered it with a concealed battery pack to make the purported "Nanopanel" appear to outperform the large standard silicon solar panel.

g.  On or around May 17, 2018, Nanotech filed its first Form D with the SEC regarding the offering.  The May 2018 Form D had multiple misstatements and omissions of material facts that were never corrected by Nanotech, including: (1) listing only D. SWEANEY as a related person, when in reality multiple other persons served as Nanotech's executive officers, including defendant and GANGE; (2) failing to disclose that while D. SWEANEY was the CEO of Nanotech on paper, Nanotech was actually controlled by defendant; (3) listing D. SWEANEY as the only individual being paid commission, when in reality Nanotech paid sales commissions to numerous "cold-callers"; (4) disclosing that D. SWEANEY would only receive $15 of the funds raised through the offering, when in reality D. SWEANEY had received substantially more of the funds raised through the offering; and (5) failing to disclose that defendant and GANGE were receiving funds raised through the offering.  GANGE, at the direction of defendant, signed and electronically filed the Form D on behalf of Nanotech.

h.  On or around June 14, 2018, Nanotech filed a second, amended, Form D with the SEC regarding the offering.  The June 2018 Form D repeated the same material misrepresentations and omissions as the May 2018 Form D, although by then defendant, D. SWEANEY and GANGE had diverted more victim-investor money to themselves.  Again, GANGE,

at the direction of defendant, signed and electronically filed the Form D on behalf of Nanotech.

  i. In or around October 2018, D. SWEANEY, at the direction of defendant, purchased approximately $300,000 in used silicon solar panel manufacturing equipment from a defunct silicon solar panel company. Defendant directed D. SWEANEY to assemble the equipment at the Nanotech facility in Loveland, Colorado. D. SWEANEY, on at least two occasions, at the direction of defendant, arranged for potential victim-investors, who wanted to verify that Nanotech had a legitimate operation, to tour the Nanotech facility in Loveland, Colorado. Defendant, and others, falsely represented to victim-investors that the equipment was valued at $100 million.

  j. On or around February 11, 2019, Nanotech filed a third Form D with the SEC regarding the offering. In the February 2019 Form D, Nanotech falsely indicated it had sold $3.6 million in securities, when in fact more than $4.8 million had been raised from investors by that point. The February 2019 Form D repeated the same material misrepresentations and omissions as Nanotech's prior two Forms D, although by then defendant, D. SWEANEY and GANGE had diverted more victim-investor money to themselves. Again, GANGE, at the direction of defendant, signed and electronically filed the Form D on behalf of Nanotech.

  k. In or around August 2019, defendant instructed GANGE, via text message, not to contradict a "cold-caller" when speaking to victim-investor A.C. and to try to stay off the phone with him. Defendant instructed GANGE to follow the "cold-caller's" lead when telling victim-investor A.C. that Nanotech had raised close to $20 million, when in reality Nanotech had raised approximately $7.6

8

million at that point.  Defendant text messaged GANGE, "ALL WE NEED IS ONE CONTRADICTION AND GUY WILL DEMAND TWO MILLION BACK."

l.   On or about September 4, 2019, defendant, masquerading under the alias "Michael Hatton," solicited an investment in Nanotech, via telephone, from an FBI Undercover Special Agent ("UC") acting as a potential investor.  During the telephone call, defendant made several material misrepresentations to the UC including: (1) Nanotech did not pay commissions to "cold-callers," when in reality Nanotech paid "cold-callers" between 10-15% commissions; (2) Nanotech's operating costs were not more than 16.5%; (3) Nanotech's equipment was worth $100 million; and (4) an investment in Nanotech was safe because Nanotech's equipment was worth more than the amount of investor funds raised.

m.   From in or around September 2017 through at least November 2019, defendant, D. SWEANEY and GANGE transferred a large portion of victim-investor funds to other entities they controlled or used the funds for personal expenses including: (1) a luxury yacht; (2) three sports cars; (3) cosmetic surgery; (4) dental care; (5) jewelry; (6) luxury fashion; and (7) Amazon purchases.

Through the fraudulent scheme described above, defendant, and others, caused over 100 victim-investors to pay Nanotech approximately $9,512,662.  (Plea Agmt. ¶ 13, at 11-19).

**III. ARGUMENT**

**A.   Advisory Guidelines Calculation**

The government agrees with the calculations in the PSR, and stipulated to in the plea agreement, set forth as follows:

   Base Offense Level:              7         U.S.S.G. § 2B1.1(a)(1)

9

| | | |
|---|---|---|
| Specific Offense Characteristics [loss of more than $9,500,000 but less than $25,000,000]: | +20 | U.S.S.G. § 2B1.1(b)(1)(K) |
| Specific Offense Characteristics [more than 10 victims]: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Adjustments [aggravating role] | +4 | U.S.S.G. § 3B1.1(a) |
| Acceptance of Responsibility | -3 | U.S.S.G. §§ 3E1.1(a), (b) |
| Total Offense Level: | 30 | |

(PSR ¶¶ 3, 69-77).

The government agrees with the USPO's calculation of Criminal History Category I. (PSR ¶¶ 93-97).

**B. Downward Variance**

Consistent with the Plea Agreement, the government respectfully requests that the Court impose a two-level downward variance under 18 U.S.C. § 3553(a), based on the totality of the circumstances in this specific case, namely, the nature and circumstances of the offense and characteristics of the defendant. With the variance, defendant's total offense level would be 28, with a corresponding Guideline range of 78 to 97 months.

**C. Other Sentencing Factors**

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in Section 3553(a). See United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006). "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a specific

10

articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence." United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

        1.    Nature and Circumstances of the Offense/History and Characteristic of Defendant

This crime was motivated by greed. As outlined in detail above and in the PSR, the offense conduct in this case was serious and therefore deserving of a significant custodial sentence. For over two years, defendant led a scheme that swindled investors out of over $9.5 million dollars. What makes the offense conduct particularly egregious was the great lengths that defendant and his coconspirators went to in order to dupe investors into investing in Nanotech. These elaborate efforts included producing a video purportedly depicting a functioning Nanopanel, purchasing used manufacturing equipment from a defunct solar panel company to stage in a warehouse for potential investors to view, and defendant masquerading under an alias to hide from investors his prior felony conviction for securities fraud. (PSR ¶¶ 12-33). Defendant was calculated in executing the scheme all while knowing that his conduct was illegal and potentially could result in his incarceration as evidenced by an e-mail defendant sent to his coconspirator D. SWEANEY on January 24, 2018 with the subject line "TO DO-TO STAY OUT OF JAIL." (PSR ¶ 24). On multiple occasions during the course of the fraudulent scheme defendant e-mailed his coconspirators instructing them to take actions intended to deceive investors for the purpose of keeping the fraudulent scheme going. Most importantly, defendant was the leader and organizer of the

scheme, actively involved in all aspects to even include personally soliciting investors. As a result of defendant's crime, investors suffered significant financial and emotional harm as reflected in the Victim Impact Statements and PSR. (PSR ¶¶ 37-66). If the investors knew who defendant was, how their money was being used, or that a Nanopanel did not exist, they surely would not have invested with Nanotech.

Defendant's prior state felony conviction for securities fraud evidences this is not the first instance in which he has defrauded investors. (PSR ¶ 92). While the proceeds of defendant's past crime were several orders of magnitude smaller than those in his current offense, this prior conviction does reveal a disturbing trend of an individual who graduated from a small-time con to a major investment scam. This prior conviction may not be a basis for further increasing defendant's sentence, as it is not reflected in his criminal history points, but it should serve as caution against the imposition of a sentence below defendant's Guidelines range.

Based on information provided to the USPO, unlike many defendants who come before this Court to be sentenced, defendant did not commit his crimes out of economic desperation. Defendant reported being gainfully employed since his prior conviction for securities fraud in 1998. (PSR ¶¶ 124-129). By his own account, defendant did not experience any significant hardship during his childhood and was raised by a loving and supportive family. (PSR ¶¶ 99-103). Defendant did report suffering from mental health issues throughout his adult life but as noted by the USPO these mental health issues did not hinder his ability to perpetrate the fraud. Indeed, despite having a demonstrated history of gainful employment

12

and coming from a supportive home, defendant rejected the path to success through hard work, and instead perpetrated this fraud on the backs of the investors.

These factors support a lengthy custodial sentence.

### 2. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

The seriousness of defendant's crime speaks for itself: for over two years he orchestrated an elaborate fraudulent scheme that resulted in 149 investors losing over $9.5 million. The seriousness and magnitude of defendant's scheme requires a significant custodial sentence that will serve as a deterrent to others who might believe such a staggering sum of money would be worth the risk of being prosecuted. More importantly, defendant's conduct demonstrates more than just a need for general deterrence applicable to all large-scale fraud schemes; rather, defendant's conduct, after he had previously been convicted of felony securities fraud, reveals the need for specific deterrence as well. (PSR ¶ 92). In orchestrating and executing this fraudulent scheme defendant evidenced that he poses a real economic danger to the community and a serious risk of recidivism. Defendant has demonstrated there is a high probability that he will return to committing fraud upon his release from custody if not sufficiently deterred by a significant custodial sentence. Indeed, the prior state felony sentence he received was not enough to deter defendant from defrauding victims again and on a much greater scale. 18 U.S.C. § 3553(a)(2)(B) (the sentence imposed is required "to afford adequate deterrence to criminal conduct," which

13

encompasses both specific and general deterrence); United States v. Goff, 501 F.3d 250, 261 (3d Cir. 2007).

The seriousness of this offense and defendant's conduct evidencing a lack of respect for the law are aggravating factors. Most significantly, however, a substantial custodial sentence is warranted in light of the need to deter defendant and generally individuals who might contemplate defrauding investors in the future. A sentence lower than 97 months recommended by the government would undermine the need to provide adequate deterrence.

### 3. Need to Avoid Unwarranted Sentence Disparities

Section 3553(a)(6) requires the Court to impose a sentence to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Goff, 501 F.3d at 258 ("Part of 'just punishment' is the avoidance of unwarranted sentencing disparities"). A sentence within the Guidelines range is usually the best way to avoid sentencing disparities. See United States v. Mares, 402 F.3d 511, 518-19 (5th Cir. 2005).

### 4. Restitution and Supervised Release

As noted in the PSR, pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $9,771,052.80 should be ordered as reflected in the list attached to the PSR. (PSR ¶ 149).

To protect the community and to ensure that defendant pays off his restitution order to the best of his ability once released from custody, the Court should also impose a three-year period of supervised release. Such a term of supervision will also provide defendant with oversight and supervision as he attempts to become a

law-abiding and contributing member of society following his release from imprisonment.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) 97 months' imprisonment; (2) a three-year term of supervised release; (3) restitution of $9,771,052.80; and (4) a $100 special assessment. The recommended sentence is sufficient but not greater than necessary to achieve the goals of sentencing.